IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

ELIZABETH J. LYKE                     )
                                      )
                                      )
v.                                    )        NO. 3:08-0510
                                      )
MICHAEL J. ASTRUE,                    )
Commissioner of Social Security       )

To: The Honorable John T. Nixon, Senior District Judge

## REPORT AND RECOMMENDATION

The plaintiff filed this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying the plaintiff's claim for Disability Insurance Benefits ("DIB"), as provided by the Social Security Act ("the Act").

Upon review of the administrative record as a whole, the Court finds that the Commissioner's determination that the plaintiff was not disabled under the meaning of the Act is supported by substantial evidence in the record as required by 42 U.S.C. § 405(g), and that the plaintiff's motion for judgment on the administrative record (Docket Entry No. 16) should be denied.

# I. INTRODUCTION

The plaintiff filed an application for DIB on June 6, 2005 (tr. 93-95), alleging a disability onset date of March 2, 2002, due to Chronic Obstructive Pulmonary Disease ("COPD") and a right foot injury.[1] (Tr. 93, 108.)  Her application for DIB was denied initially and upon reconsideration. (Tr. 54-56, 58-59.) A hearing before Administrative Law Judge ("ALJ") John P. Gardner was held on March 20, 2007. (Tr. 27-49.) The ALJ delivered an unfavorable decision on September 26, 2007 (tr. 12-20), and the plaintiff sought review by the Appeals Council. (Tr. 8.)  On April 11, 2008, the Appeals Council denied the plaintiff's request for review (tr. 2-4), and the ALJ's decision became the final decision of the Commissioner.

# II. BACKGROUND

The plaintiff was born on October 23, 1956, and was 45 years old as of March 2, 2002, her alleged onset date. (Tr. 93.)  She completed college (tr. 31, 115) and worked full-time as a teacher, as a substitute teacher, and part-time as a grading clerk. (Tr. 135-39.)

---

[1] In 1988, the plaintiff was in a car accident that severely injured the lymphatic system in her right foot. (Tr. 35.)  This injury is mentioned only in the plaintiff's disability application and hearing testimony, not in the plaintiff's medical records.

## A. Chronological Background: Procedural Developments and Medical Records[2]

In May of 1995, the plaintiff presented to the psychiatric center at Summit Medical Center ("Summit") and was diagnosed with post traumatic stress disorder ("PTSD") after she was assaulted by a student at the school where she taught. (Tr. 203.) The plaintiff received therapy for PTSD from May of 1995 through February of 1997, but those medical records have since been destroyed. (Tr. 184.) The plaintiff returned to Summit in October 1995 and was diagnosed with right lower lobe pneumonia, bronchitis, and asthma exacerbation. (Tr. 185-99.) Between August and October of 1995, the plaintiff presented to Cumberland Lung and Sleep Specialists four times and was diagnosed with asthma, allergic rhinitis, pneumonia, and bronchitis. (Tr. 249.)

On March 28, 2002, the plaintiff went to the Middle Tennessee Medical Center Emergency Department for shortness of breath and chest pain, and she was diagnosed with acute respiratory distress, severe bronchospasm, chest pain, obesity, and pedal edema. (Tr. 277-78, 284, 287.) She was given Prednisone,[3] and aerosol and Proventil treatment.[4] (Tr. 278.) A chest x-ray revealed a nodule in her right lung, an initial echocardiogram ("EKG") revealed "sinus rhythm with no acute ST-T changes," and a second EKG showed normal functioning. She was admitted to the hospital and given antibiotics, oxygen

---

[2] Every attempt to decipher the medical evidence of record was undertaken; however, some handwritten notations or poor copies made some of the records illegible.

[3] Prednisone is a corticosteroidal anti-inflammatory drug. Saunders Pharmaceutical Word Book 575 (2009) ("Saunders").

[4] Proventil is an inhaled aerosol used to treat or prevent bronchospasm. Physicians Desk Reference 3204 (64th ed. 2010) ("PDR").

supplementation, aerosol breathing, intravenous Solu-Medrol,[5] and Levaquin.[6] She was discharged from the hospital on March 30, 2002, prescribed Zaroxolyn,[7] Zithromax,[8] and a Medrol Dosepak,[9] and advised to continue to take her prior nebulizers and medications, which included Albuterol,[10] Accupril,[11] Synthroid,[12] Premarin,[13] potassium, Lasix,[14] and Prozac. (Tr. 278, 283-84, 287-88.)

On June 14, 2002, the plaintiff presented to Dr. Arikana Chihombori[15] and underwent a Pulmonary Function Test ("PFT"), stress test, Thyroid Function Test ("TFT"),

---

[5] Solu-Medrol is a corticosteroid, anti-inflammatory, and immunosuppressant powder used in an intravenous injection. Saunders at 653.

[6] Levaquin is an antibiotic used to treat pneumonia, sinusitis, and bronchitis. PDR at 2629.

[7] Zaroxolyn is used to treat hypertension. Saunders at 774.

[8] Zithromax is an antibiotic. Saunders at 778.

[9] Medrol Dosepak is the tablet form of Solu-Medrol, *see supra* n.3. Saunders at 433.

[10] Albuterol is an inhaler used in treatment or prevention of bronchospasms. PDR at 3393.

[11] Accupril is used to treat congestive heart failure. Saunders at 4.

[12] Synthroid is prescribed to treat symptoms of thyroid deficiency. Saunders at 678.

[13] Premarin is prescribed for the prevention and treatment of postmenopausal symptoms. Saunders at 576.

[14] Lasix is prescribed to treat hypertension. Saunders at 398.

[15] Both the plaintiff and defendant classify treatment notes from June of 2002 to November of 2003 (tr. 304-330) as medical records from Dr. Chihombori, *see* Docket Entry No. 17, at 3 and Docket Entry No. 20, at 3-4, even though many of the medical forms do not have a signature or have a signature that is illegible.

and Thyroid-Stimulating Hormone test ("TSH"). (Tr. 313-14.)  The PFT indicated that the plaintiff's height measured 61 inches, that she weighed 247 pounds, and that she registered a forced vital capacity ("FVC")[16] of 2.00 liters and a forced expiratory volume in one second ("$FEV_1$")[17] of 1.71 liters. (Tr. 327.)  The Cardiopulmonary Exercise test record indicated that the plaintiff gave submaximal effort but also showed that she had a severe reduction in work and functional capacity. (Tr. 330.)  Dr. Chihombori diagnosed the plaintiff with obesity, chest pain, shortness of breath, asthma, COPD, heart palpitations, and hypertension, and prescribed Albuterol. (Tr. 313.)

In July of 2002, the plaintiff underwent a PFT that showed she measured 61 inches in height, weighed 247 pounds, and registered a FVC of 2.38 liters and a $FEV_1$ of 1.96 liters. (Tr. 324.)  Dr. Chihombori examined the plaintiff on two occasions in July of 2002, again diagnosed her with obesity, asthma, COPD, and shortness of breath, and prescribed Albuterol. (Tr. 311-12.)  On December 31, 2002, the plaintiff returned to Dr. Chihombori with complaints of numbness in both hands, and she was diagnosed with radiculopathy and edema and prescribed Lasix and Zaroxolyn.[18]  (Tr. 310.)  On February 1, 2003, Dr. Chihombori examined the plaintiff and opined that she had occasional shortness of

---

[16] FVC is the measurement of the maximum amount of air an individual is able to exhale in a single breath. Johns Hopkins Medicine, "Pulmonary Function Laboratory," at http://www. hopkinsmedicine.org/pftlab/pftests.html.

[17] $FEV_1$ is the measurement of the amount of air an individual is able to exhale in the first second of a PFT. Johns Hopkins Medicine, "Pulmonary Function Laboratory," at http://www. hopkinsmedicine.org/pftlab/pftests.html.

[18] Zaroxolyn is prescribed to treat hypertension. Saunders at 774.

breath, wheezing, dizziness, and asthma. (Tr. 309.)  The plaintiff also underwent a PFT that indicated she was 64 inches tall, weighed 235 pounds,  and registered a FVC of 2.4 liters and $FEV_1$ of 2.07 liters. (Tr. 309, 322.)

On August 28, 2003, the plaintiff presented to Dr. Chihombori and underwent a PFT and Graded Exercise Testing ("GXT"). (Tr. 307.)  The PFT showed that the plaintiff measured 64 inches in height, weighed 248 pounds, and registered a FVC of 2.23 liters and a $FEV_1$ of 1.87. (Tr. 320.) Dr. Chihombori noted that the plaintiff "gave good effort" on both the PFT and GXT but had to terminate the GXT due to shortness of breath and leg fatigue. (Tr. 307.)  She diagnosed the plaintiff with hypertension, COPD, chronic fatigue, obesity, and shortness of breath with wheezing, and recommended that the plaintiff lose weight, "watch [her] diet," exercise regularly, and take her medication. *Id.*  Dr. Chihombori examined the plaintiff on multiple occasions between October of 2003, and January of 2004, diagnosed her with hypertension, COPD, radiculopathy, osteoporosis, sinusitis, and carpal tunnel syndrome, and prescribed Alavert,[19] Glucophage,[20] and Prempro.[21] (Tr. 221-25.)

On January 15, 2004, Dr. Anna Louise Molette, a physiatrist,[22] examined the plaintiff and opined that she had carpal tunnel syndrome. (Tr. 302.)  Lab results also showed that

---

[19] Alavert is an antihistamine. Saunders at 21.

[20] Glucophage is antidiabetic medication. Saunders at 322.

[21] Prempro is hormone replacement medication prescribed for postmenopausal symptoms. Saunders at 576.

[22] A physiatrist is a doctor with specialized training in physical medicine, including pain management and rehabilitation. Dorland's Illustrated Medical Dictionary 1434 (30th ed. 2003) ("Dorland's").

the plaintiff had hypothyroidism[23] and she was prescribed Levoxyl.[24] (Tr. 235.) On February 20, 2004, upon referral from Dr. Chihombori, the plaintiff presented to Dr. Muyiwa Adedokun at Comprehensive Surgical Care Inc. and he diagnosed the plaintiff with "[b]ilateral carpal tunnel syndrome ([r]ight worse than [l]eft)," performed a right carpal tunnel release,[25] and prescribed Lortab.[26] (Tr. 206-09, 303.)

Between February of 2004 and June of 2005, the plaintiff presented to Dr. Chihombori on multiple occasions. (Tr. 214-20, 351.) Dr. Chihombori diagnosed her with hypertension, COPD, hyperthyroidism, hyperlipidemia, osteoporosis, sinusitis, acute bronchitis, metabolic syndrome, obesity, left heel pain/heel spur, amenorrhea, edema, shortness of breath, and anxiety/PTSD, and prescribed Cipro,[27] Levaquin, Metformin,[28] and Xanax.[29] *Id.* A June 24, 2005, PFT indicated that the plaintiff measured 60 inches in height, weighed 235 pounds, and gave a FVC of 2.05 liters and a FEV$_1$ of 1.69 liters. (Tr. 350.)

---

[23] Hypothyroidism is a deficiency of thyroid activity, "characterized by decrease in basal metabolic rate, tiredness and lethargy, sensitivity to cold, and menstrual disturbances." Dorland's at 900.

[24] Levoxyl is a synthetic thyroid hormone. Saunders at 404.

[25] Dr. Adedokun suggested that the plaintiff undergo surgery on her left wrist, eight weeks after her right carpal tunnel release (tr. 303), but there is no evidence of that procedure in the record.

[26] Lortab is a pain reliever with the generic name of hydrocodone. Saunders at 415.

[27] Cipro is an antibiotic. Saunders at 162.

[28] Metformin is an antidiabetic drug used to control blood sugar levels. Saunders at 441.

[29] Xanax is used to treatment panic disorders and agoraphobia. PDR at 768.

On November 8, 2005, Dr. R. Payne, a Tennessee Disability Determination Section ("DDS") consultative examiner from Alternative Testing Services, completed an "all systems examination"(tr. 250-60), noted that the plaintiff's medical history indicated that she had asthma/COPD, hypertension, hypothyroidism, and PTSD, and diagnosed her with edema, obesity, and visual acuity deficit. (Tr. 258-59.) Dr. Payne opined that the plaintiff's "strength was 5/5 in all major muscle groups," that she had a "full range-of-motion universally," but that her ability "to walk, twist, turn, bend and lift was adversely affected" by her obesity. (Tr. 255, 257.) A PFT showed that the plaintiff measured 60 inches in height, weighed 241 pounds, and registered a FVC of 1.53 liters and a $FEV_1$ of 1.11 liters. (Tr. 261.) Dr. Payne noted that in an eight hour day the plaintiff could lift/carry twenty pounds occasionally and ten pounds frequently and stand/walk for at least two hours, had no sitting restrictions, and had depression. (Tr. 259.)

On December 4, 2005, Dr. Reeta Misra, a non-examining DDS physician, completed a physical residual functional capacity ("RFC") assessment (tr. 264-71) and determined that the plaintiff could lift/carry ten pounds occasionally and less than ten pounds frequently, stand/walk for at least two hours in an eight hour workday, sit for about six hours in an eight hour workday, push/pull an unlimited amount, and occasionally climb, balance, stoop, kneel, crouch, and crawl. (Tr. 265-66.) Dr. Misra opined that the plaintiff should avoid concentrated exposure to pulmonary irritants such as fumes, odors, dusts, gases, and poor ventilation. (Tr. 268.) Dr. Misra concluded that, although her lung condition was a "severe" impairment, it fell short of a Listing. (Tr. 271.)

On August 8, 2006, Dr. Chihombori completed a physical capacities evaluation ("PCE") (tr. 273-74) and found that in an eight hour workday the plaintiff could sit for six or more hours and two hours consecutively and stand/walk for one hour, could perform simple grasping with her left and right hands, could not push/pull or finely manipulate with her left or right hands, could lift 20 to 49 pounds rarely, 10 to 19 pounds occasionally, and zero to nine pounds frequently, and could carry 20 to 49 pounds rarely, five to 19 pounds occasionally, and zero to four pounds frequently. (Tr. 273-74.) She opined that the plaintiff should never squat and rarely climb, could occasionally crawl and reach above her shoulder, and could frequently bend. (Tr. 274.) Dr. Chihombori concluded that the plaintiff should not be exposed to dust, fumes, gases, and changes in temperature and humidity, that her exposure to unprotected heights and moving machinery should be severely restricted, and that her driving should be moderately restricted. *Id.* She also noted that the plaintiff's "major limitation" was respiratory because minimal exertion caused her shortness of breath. *Id.*

On December 19, 2006, Dr. Chihombori completed a physical Medical Source Statement of Ability to Do Work-Related Activities ("Medical Source Statement") (tr. 355-58) and found that in an eight hour work day the plaintiff could lift/carry ten pounds occasionally and less than ten pounds frequently and stand/walk for less than two hours. (Tr. 355.) She determined that the plaintiff's ability to sit was not affected but that her ability to push/pull in her lower and upper extremities was limited. (Tr. 356.) Dr. Chihombori opined that the plaintiff could occasionally climb but should never balance, kneel, crouch, crawl, or stoop, and that her ability to reach would be limited in all

directions. (Tr. 356-57.) Further, Dr. Chihombori noted that the plaintiff would be limited when working in environments with extreme temperatures, dust, vibration, humidity/wetness, hazards, and fumes, odors, chemicals, or gases. (Tr. 358.) She explained that the plaintiff's restrictions were due to COPD and limited respiratory capacity. (Tr. 356-58.)

### B. Hearing Testimony

At the hearing before the ALJ, the plaintiff was represented by counsel, and the plaintiff and Dr. Gordon Doss, Ph.D., a Vocational Expert ("VE"), testified. (Tr. 27-49.) The plaintiff testified that she has a college degree, and was previously employed as a teacher, grading clerk, and communication services salesperson. (Tr. 30-31, 46-48.) She explained that she left teaching in March of 2002 when she was diagnosed with COPD because teaching is a very active job and her COPD made it difficult for her to breathe when she performed even the simplest of tasks. (Tr. 31-31.) The plaintiff related that she does "very little housework" but that she is able to wash dishes, do laundry, drive, and go to the grocery store but has difficulty walking around the store due to her COPD. (Tr. 32-33.) She testified that she is 61 inches tall, weighs "about 250" pounds, has difficulty moving around, and has hand cramps due to carpal tunnel syndrome. (Tr. 33-34.) The plaintiff related that she was assaulted at school in 1995 and that she was able to return to teaching after receiving psychiatric counseling but that she still occasionally takes medication for anxiety attacks. (Tr. 34-35.) She also testified that she does not have vision difficulties but that she needs glasses. (Tr. 38.)

The VE classified the plaintiff's past work as a public school teacher as light and skilled and related that her teaching skills would transfer to sedentary jobs, such as a receptionist or information clerk. (Tr. 37.) Next, he classified the plaintiff's past work as a grading clerk as sedentary and unskilled and determined that skills from that job would not transfer. *Id.*

The ALJ asked the VE to consider Dr. Payne's consultative examination (tr. 250-60) and what type of work that the plaintiff could perform, and the VE replied that she could return to her past work at the light and sedentary RFC levels. (Tr. 38.) The ALJ then asked the VE to consider Dr. Misra's physical RFC assessment (tr. 264-71) and the work that the plaintiff could perform, and the VE testified that she could return to her previous sedentary work as a grading clerk. (Tr. 39.) Next, the ALJ asked the VE to consider Dr. Chihombori's PCE (tr. 273-74) and the work that the plaintiff could perform, and the VE replied that she could perform her past work since her "inability to use [her] hands for repetitive fine manipulative impact" and standing restriction of two hours would not negatively impact her past work. (Tr. 39-40.)

The plaintiff's attorney asked the ALJ to consider Dr. Chihombori's Medical Source Statement (tr. 355-58) and what type of work that the plaintiff could perform, and the VE replied that the plaintiff could perform her past work as a grading clerk and that her job skills would transfer to sedentary work. (Tr. 40-41.) The VE related that the plaintiff's transferable skills include communication skills, attention skills, and ability to make judgments. (Tr. 41.) Although the ALJ noted that literacy was also required, he explained that literacy "is not a skill or learned capability." *Id.*

The plaintiff testified that her grading clerk job was part-time and seasonal (tr. 42) and that she would have difficulty working as a receptionist since she has a coughing reaction after talking on the phone for only a few minutes. (Tr. 45.) The ALJ then asked the VE whether the plaintiff's part-time work as a grading clerk would be sufficient to gain the skills needed to perform the semi-skilled work, and the VE replied that if the plaintiff had worked for only one session and had graded only one type of test that her skills might not be transferable but that her skills would be transferable to semi-skilled work if she were able to score "a number of different types of tests." (Tr. 47-48.)

### III. THE ALJ'S FINDINGS

The ALJ issued an unfavorable decision on September 26, 2007. (Tr. 12-20.) Based on the record, the ALJ made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2007.

2. The claimant has not engaged in substantial gainful activity since March 2, 2002, the alleged onset date (20 CFR 404.120(b) and 404.1571 *et seq.*).

3. The claimant has the following severe impairments: limited pulmonary functioning (chronic obstructive pulmonary disease [COPD], asthma and recurrent allergies); and obesity (height variously measured at 60-64 inches [5 feet to 5 feet, 4 inches] and weight ranging from about 230-250 pounds) (20 CR 404.1520(c)).

\* \* \*

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526).

* * *

5.      The claimant has the residual functional capacity to perform sedentary work (lift/carry up to 10 pounds, stand/walk for 2 out of 8 hours and sit for 6 out of 8 hours) with occasional postural activities and no exposure to concentrated pulmonary irritants.

* * *

6.      The claimant is capable of performing past relevant work as a grading clerk. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

* * *

7.      The claimant has not been under a disability, as defined in the Social Security Act, from March 2, 2002, through the date of this decision (20 CFR 404.1520(f)).

(Tr. 14-20.)

# IV. DISCUSSION

## A. Standard of Review

The determination of disability under the Act is an administrative decision, and the only questions before this Court are whether the decision of the Commissioner is supported by substantial evidence and whether the Commissioner employed the proper

legal standards in reaching his conclusion. 42 U.S.C. § 405(g). *See Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971) (adopting and defining substantial evidence standard in context of Social Security cases); *Kyle v. Comm'r Soc. Sec.*, 609 F.3d 847, 854 (6th Cir. 2010). The Commissioner's decision must be affirmed if it is supported by substantial evidence, "even if there is substantial evidence in the record that would have supported an opposite conclusion." *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir.1997)); *Jones* v. *Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003); *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). Substantial evidence is defined as "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938)); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007); *Le Master v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976) (quoting Sixth Circuit opinions adopting language substantially similar to that in *Richardson*).

A reviewing court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *See, e.g., Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984) (citing *Myers v. Richardson*, 471 F.2d 1265, 1268 (6th Cir. 1972)). The Court must accept the ALJ's explicit findings and determination unless the record as a whole is without substantial evidence to support the ALJ's determination. 42 U.S.C. § 405(g). *See, e.g., Houston v. Sec'y of Health & Human Servs.*, 736 F.2d 365, 366 (6th Cir. 1984).

The Commissioner must employ a five-step evaluation process in determining the issue of disability. *See, e.g., Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001)

(citing *Abbot v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)). The original burden of establishing disability is on the plaintiff, and impairments must be demonstrated by medically acceptable clinical and laboratory diagnostic techniques. *See* 42 U.S.C. § 1382c(a)(3)(D); 20 C.F.R. §§ 404.1512(a), (c), 404.1513(d). First, the plaintiff must show that she is not engaged in "substantial gainful activity" at the time she seeks disability benefits. *Id.* (citing 20 C.F.R. §§ 404.1520(b), 416.920(b)); *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 539 (6th Cir. 2007). A plaintiff who is performing substantial gainful activity is not disabled no matter how severe the plaintiff's medical condition may be. *See, e.g., Dinkel v. Sec'y of Health & Human Servs.*, 910 F.2d 315, 318 (6th Cir. 1990).

Second, the plaintiff must show that she suffers from a "severe impairment." A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Id.* (citing 20 C.F.R. §§ 404.1520(c), 416.920(c)). Basic work activities are "the abilities and aptitudes necessary to do most jobs," such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; [c]apacities for seeing, hearing, and speaking; [u]nderstanding, carrying out, and remembering simple instructions; [u]se of judgment; [r]esponding appropriately to supervision, co-workers and usual work situations; and [d]ealing with changes in a routine work setting." 20 C.F.R. § 404.1521(b). The Commissioner is required to consider the combined effects of impairments that individually are not severe but cumulatively may constitute a severe impairment. 42 U.S.C. § 423(d)(2)(B); *Foster v. Bowen*, 853 F.2d 483, 490 (6th Cir. 1988).

Third, if the plaintiff is not engaging in substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of

at least twelve months, and her impairment meets or equals a listed impairment, the plaintiff is presumed disabled without further inquiry, regardless of age, education or work experience. *Id.* (citing 20 C.F.R. §§ 404.1520(d), 416.920(d)). The plaintiff may establish that she meets or equals a listed impairment, and that the impairment has lasted or is expected to last for at least twelve months or result in death. *See Listenbee v. Sec'y of Health & Human Servs.*, 846 F.2d 345, 350 (6th Cir. 1988). The plaintiff is not required to show the existence of a listed impairment in order to be found disabled, but such a showing results in an automatic finding of disability. *See Blankenship v. Bowen*, 874 F.2d 1116, 1122 (6th Cir. 1989).

Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, she is not disabled. *Id.* The plaintiff has the burden of proving inability to perform past relevant work, or proving that a particular past job should not be considered relevant. *Cruse*, 502 F.3d at 539; *Jones*, 336 F.3d at 474 ("Through step four, the [plaintiff] bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work."); *Smith v. Sec'y of Health & Human Servs.*, 893 F.2d 106, 109 (6th Cir. 1989). If the plaintiff fails to carry this burden, she must be denied disability benefits.

Once the plaintiff establishes a *prima facie* case that she is unable to perform her prior relevant employment, the burden shifts in step five to the Commissioner to show that the plaintiff can perform other substantial gainful employment, and that such employment exists in the national economy. *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005); *See, e.g., Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). To rebut a *prima facie* case, the Commissioner must come forward with proof of the existence of other jobs a

plaintiff can perform. *Longworth*, 402 F.3d at 595; *See Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 528 (6th Cir. 1981), *cert. denied*, 461 U.S. 957, 103 S.Ct. 2428, 77 L.Ed.2d 1315 (1983) (upholding the validity of the medical-vocational guidelines grid as a means for the Commissioner of carrying his burden under appropriate circumstances). It remains the plaintiff's burden to prove the extent of her functional limitations. *Her*, 203 F.3d at 391. Even if the plaintiff's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the plaintiff can perform, she is not disabled. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009); *Her*, 203 F.3d at 391. *See also Tyra v. Sec'y of Health & Human Servs.*, 896 F.2d 1024, 1028-29 (6th Cir. 1990); *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 88-89 (6th Cir. 1985); *Mowery v. Heckler*, 771 F.2d 966, 969-70 (6th Cir. 1985).

If the question of disability can be resolved at any point in the sequential evaluation process, the claim is not reviewed further. 20 C.F.R. § 404.1520(a)(4). *See also Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (holding that resolution of plaintiff's claim at step two of the evaluative process is appropriate in some circumstances).

### B. The Five Step Process

In this case, the ALJ resolved the plaintiff's claim at step four of the five-step process. (Tr. 19-20.) At step one, the ALJ determined that the plaintiff successfully demonstrated that she had not engaged in substantial gainful activity since March 2, 2002, the alleged onset date of disability. (Tr. 14.) At step two, the ALJ found that the plaintiff's limited pulmonary functioning and obesity were severe impairments. *Id.* At step three, the

ALJ determined that the plaintiff's impairments, either singly or in combination, did not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation 4. (Tr. 16.)  At step four, the ALJ determined that the plaintiff was capable of performing her past relevant work as a grading clerk. (Tr. 19.)

The ALJ also included an alternate step five determination and concluded that since the plaintiff's teaching job skills were transferrable, she could also perform two jobs at the sedentary level: receptionist/information clerk and general office clerk. (Tr. 20.)

### C. Plaintiff's Assertions of Error

The plaintiff contends that the ALJ failed to give sufficient weight to the findings of her treating physician, erred at step three in determining that the plaintiff's impairments did not meet or medically equal Listing 3.02, and failed to properly consider the plaintiff's obesity according to Social Security Ruling ("SSR") 02-1p. Docket Entry No. 17 at 7-10.  She also contends that the ALJ erred in characterizing the plaintiff's part-time test grading work as past relevant work and in accepting the flawed testimony of the VE. Docket Entry No. 17, at 11-14.

### 1. The ALJ gave appropriate weight to the plaintiff's treating physician.

The plaintiff argues that the ALJ erred in not giving controlling weight to Dr. Chihombori's PCE. Docket Entry No. 17, at 9-10.  Dr. Chihombori completed both a PCE and Medical Source Statement, and although the plaintiff did not specify which

assessment she contends should receive controlling weight, the medical findings that she

sets forth in her memorandum align with Dr. Chihombori's PCE. Docket Entry No. 17, at

10; tr. 273-74.

Given the regularity with which Dr. Chihombori examined the plaintiff (tr. 214-25,

273-74, 307-14, 355-58), she is classified as a treating source under 20 C.F.R. § 404.1502.[30]

Treating physicians are "the medical professionals most able to provide a detailed,

longitudinal picture of [a plaintiff's] medical impairment(s) and may bring a unique

perspective to the medical evidence that cannot be obtained from objective medical

findings alone." 20 C.F.R. § 404.1527(d)(2). Generally, an ALJ is required to give

"controlling weight" to the medical opinion of a treating physician, as compared to the

medical opinion of a non-treating physician, if the opinion of the treating source is "well-

supported by medically acceptable clinical and laboratory diagnostic techniques and is not

---

[30] A treating source, defined by 20 C.F.R. § 404.1502, is
your own physician, psychologist, or other acceptable medical source who
provides you, or has provided you, with medical treatment or evaluation and
who has, or has had, an ongoing treatment relationship with you. Generally,
we will consider that you have an ongoing treatment relationship with an
acceptable medical source when the medical evidence establishes that you
see, or have seen, the source with a frequency consistent with accepted
medical practice for the type of treatment and/or evaluation required for
your medical condition(s). We may consider an acceptable medical source
who has treated or evaluated you only a few times or only after long
intervals (e.g., twice a year) to be your treating source if the nature and
frequency of the treatment or evaluation is typical for your condition(s).

inconsistent with the other substantial evidence in [the] case record." *Id.* (quoted in *Tilley v. Comm'r of Soc. Sec.*, 394 Fed. Appx. 216, 222 (6th Cir. Aug. 31, 2010); *Hensley v. Astrue*, 573 F.3d 263 (6th Cir.2009). This is commonly known as the treating physician rule. *See* Soc. Sec. Rul. 96-2p, 1996 WL 374188 (July 2, 1996); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

As the plaintiff correctly points out, even if a treating source's medical opinion is not given controlling weight, it is "still entitled to deference and *must be weighed using all of the factors provided in 20 C.F.R. 404.1527* . . . ." *Fisk v. Astrue*, 253 Fed. Appx. 580, 585 (6th Cir. Nov. 9, 2007) (quoting Soc. Sec Rul. 96-2p, 1996 WL 374188, at *4) (emphasis in original). The ALJ must consider

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the supportability of the opinion with respect to relevant evidence such as medical signs and laboratory findings; (4) the consistency of the opinion with the record as a whole; (5) the specialization of the physician rendering the opinion; and (6) any other factor raised by the applicant.

*McGrew v. Comm'r of Soc. Sec.*, 343 Fed. Appx. 26, 30 (6th Cir. Aug. 19, 2009) (citing *Wilson*, 378 F.3d at 544); *Meece v. Barnhart*, 192 Fed. Appx. 456, 461 (6th Cir. Aug. 8, 2006) (quoting 20 C.F.R. § 404.1527(d)(2)-(6)). The ALJ must also provide "good reasons" for the resulting weight given to the treating source. Soc. Sec Rul. 96-2p, 1996 WL 374188, at *5 (citing 20 C.F.R. § 404.1527(d)(2)); *Brock v. Comm'r of Soc. Sec.*, 2010 WL 784907, at *2 (6th Cir. Mar. 8, 2010). The "good reasons" must be "sufficiently specific to make clear to any subsequent

reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight," Soc. Sec Rul. 96-2p, 1996 WL 374188, at *5 (citing 20 C.F.R. § 404.1527(d)(2)), and so that the plaintiff understands the disposition of her case. *Wilson*, 378 F.3d at 544 (citing *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999)).

In this case, the ALJ focused on the factor of inconsistency in concluding that Dr. Chihombori's PCE should not be given controlling weight. (TR. 19.) However, the ALJ did not entirely discount Dr. Chihombori's findings. The ALJ explained that

> Dr. Chihombori's opinions have some support in the evidence. For instance, his [sic] assessed limitations with regard to ability to sustain sitting are well supported. However, the objective evidence and the [plaintiff's] daily activities indicate that he [sic] was excessively restrictive on several counts in addition to use of the hands. For instance, her grocery shopping 1-2 times a week and doing laundry and cooking for herself and at least 2 adult sons in the home indicate lift/carry ability for at least the upper end of the limitations that he assessed. These and the other daily activities also indicate that he [sic] was overly restrictive on standing/walking and postural activities, as well as on environmental limitations. Therefore, Dr. Chihombori's opinions are not entitled to controlling weight in this decision, even though he [sic] is a treating physician, because his [sic] opinions, taken as a whole, are not well supported by the weight of the evidence.

*Id.* Dr. Chihombori, who completed a PCE on August 8, 2006, and a Medical Source Statement on December 19, 2006, and two consultative DDS physicians, Dr. Misra and Dr. Payne, all completed physical assessments on the plaintiff. (Tr. 250-60, 264-71, 273-74, 355-58.)

In the PCE, Dr. Chihombori opined that in an eight hour workday the plaintiff could lift/carry less than 20 pounds frequently, occasionally lift less than 10 pounds and carry less

than five pounds, stand/walk for one hour, sit for six hours or more, and perform simple grasping with her left and right hands but could not push/pull or finely manipulate with either hand. (Tr. 273-74.) She also found that the plaintiff should never squat, should rarely climb, could occasionally crawl and reach above her shoulder, and could frequently bend. (Tr. 274.) Dr. Chihombori concluded that the plaintiff should not be exposed to dust, fumes, gases, and changes in temperature and humidity, that her exposure to unprotected heights and moving machinery should be severely restricted, and that her driving should be moderately restricted. *Id.*

In the Medical Source Statement, Dr. Chihombori determined that in an eight hour work day the plaintiff could lift/carry ten pounds occasionally and less than ten pounds frequently and stand/walk for less than two hours, that her ability to sit was not affected but that her ability to push/pull in her lower and upper extremities was limited, and that she could occasionally climb but should never balance, kneel, crouch, crawl, or stoop. (Tr. 355-56.) Dr. Chihombori noted that the plaintiff's ability to reach would be occasionally limited but that her fine and gross manipulation and feeling were not limited. (Tr. 357.) She also found that the plaintiff would be limited when working in environments with extreme temperatures, dust, vibration, humidity/wetness, hazards, and fumes, odors, chemicals, or gases. (Tr. 358.)

Dr. Misra opined that the plaintiff could lift/carry ten pounds occasionally and less than ten pounds frequently, stand/walk for at least two hours in an eight hour workday, sit for about six hours in an eight hour workday, push/pull an unlimited amount, and occasionally climb, balance, stoop, kneel, crouch, and crawl. (Tr. 265-66.) Dr. Misra noted

that the plaintiff had no imitations with fine or gross manipulation and should avoid concentrated exposure to pulmonary irritants such as fumes, odors, dusts, gases, and poor ventilation. (Tr. 267-68.) Dr. Payne determined that in an eight hour day the plaintiff could lift/carry twenty pounds occasionally and ten pounds frequently and stand/walk for at least two hours, had no sitting restrictions, and had depression. (Tr. 259.)

First, Dr. Chihombori's PCE is slightly inconsistent with and more restrictive than her Medical Source Statement, even though she completed the Medical Source Statement four months after the PCE. The PCE indicates that the plaintiff could stand/walk for one hour, could sit for six hours or more, and could not use her hands for pushing, pulling, or fine manipulation. (Tr. 274-74.) In contrast, Dr. Chihombori's Medical Source Statement shows that the plaintiff could stand/walk for less than two hours, that her ability to sit was not restricted, and that her ability to use her hands for fine and gross manipulations was not limited. (Tr. 355-57.) Next, Dr. Chihombori's PCE is inconsistent with the plaintiff's daily activities. The plaintiff testified that although she does "very little housework," she is able to do laundry, wash dishes, prepare simple meals, and shop for groceries. (Tr. 32-33.) The ALJ specifically pointed to the plaintiff's daily activities as his reasoning for determining that her ability to use her hands was not significantly limited and for ultimately concluding that Dr. Chihombori's PCE deserved less weight than Dr. Misra's RFC assessment. (Tr. 19.)

Finally, the only significant variations between Dr. Misra's RFC assessment, which the ALJ assigned controlling weight, and Dr. Chihombori's Medical Source Statement is in the postural and environmental limitations categories. (Tr. 266, 268, 356, 358.)

Dr. Chihombori's Medical Source Statement was more restrictive in both categories, but Dr. Misra did find that the plaintiff should avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation (tr. 268) because of her pulmonary impairment. (Tr. 271.) The plaintiff also contends that Dr. Misra relied strictly upon Dr. Payne's assessment and that, since Dr. Misra rejected Dr. Payne's findings, the ALJ should discount Dr. Misra's RFC assessment. Docket Entry No. 22, at 2. It is true that Dr. Misra did rely on Dr. Payne's evaluation and noted, albeit confusingly, that the "MA,S [from Dr. Payne's assessment][31] are too restricted for the objective findings." (Tr. 271) However, contending that Dr. Misra "rejected" Dr. Payne's conclusions is an overstatement since Dr. Misra's RFC assessment is actually more favorable to the plaintiff than Dr. Payne's evaluation because Dr. Misra determined that the plaintiff could occasionally lift/carry less weight, had a sitting restriction, had postural limitations, and should avoid exposure to fumes, odors, dusts, gases, and poor ventilation. (Tr. 258-29, 264-65.)

In sum, the ALJ did not err in assigning less than controlling weight to Dr. Chihombori's PCE. He focused on the factor of inconsistency, provided "good reasons," as required by SSR 96-2p, 1996 WL 374188, at *5 (citing 20 C.F.R. §§ 404.1527(d)(2)), and there is substantial evidence in the record to support his determination.

---

[31] The Court assumes that "MA,S" is a reference to Dr. Payne's "Medical Assessments."

**2. The ALJ properly determined that the plaintiff did not meet or equal Listing 3.02A.**

The plaintiff contends that she meets or equals the criteria for Listing 3.02A, 20 C.F.R. Pt. 404, Subpt. P, App. 1, for COPD and is entitled to a finding of disability at step three of the five step sequential evaluation process. Docket Entry No. 17, at 7-9; Docket Entry No. 22, at 1-3. Specifically, the plaintiff asserts that she satisfies Listing 3.02A since she is 61 inches tall and registered a $FEV_1$ of 1.11 on a PFT, and that the ALJ did not properly consider her obesity in concluding that she did not equal Listing 3.02A. *Id.*

As noted in *Little v. Astrue*, "'the burden of proof lies with the [plaintiff] at steps one through four of the [sequential disability benefits analysis],' including proving presumptive disability by meeting or exceeding a Medical Listing at step three." 2008 WL 3849937, at *4 (E.D.Ky. Aug. 15, 2008) (quoting *Her*, 203 F.3d at 391). Thus, the plaintiff "'bears the burden of proof at Step Three to demonstrate that she has or equals an impairment listed in 20 C.F.R. part 404, subpart P, appendix 1.'" *Little*, 2008 WL 3849937, at *4 (quoting *Arnold v. Comm'r of Soc. Sec.*, 238 F.2d 419, 2000 WL 1909386, at *2 (6th Cir. Dec. 27, 2000)). The plaintiff's impairment must meet all of the listing's specified medical criteria and "[a]n impairment that meets only some of the criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530-532, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990). *See also Elam ex rel. Golay v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003). At Step Three,

> [i]f the [plaintiff] is not performing substantial gainful work and has a severe impairment (or impairments) that has lasted or is expected to last for a continuous period of at least twelve months, and [her] impairment (or impairments) meets or medically equals a listed impairment contained in

Appendix 1, Subpart P, Regulation No. 4, the claimant is disabled without further inquiry.

*Little*, 2008 WL 3849937, at *1. If the plaintiff demonstrates that her impairment meets or equals a listed impairment, then the ALJ "'must find the [plaintiff] disabled.'" *Little*, 2008 WL 3849937, at *4 (quoting *Buress v. Sec'y of Health and Human Servs.*, 835 F.2d 139, 140 (6th Cir. 1987)).

Listing 3.02A provides that the plaintiff will be found disabled if she has a "[c]hronic obstructive pulmonary disease, due to any cause, with the $FEV_1$ equal to or less than the values specified in table I corresponding to the person's height without shoes." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 3.02A. Further, the introductory language to Listing 3.00 provides that if the plaintiff underwent multiple pulmonary function tests, resulting in varying $FEV_1$ scores, that "[t]he highest value[] of $FEV_1$ [scores] . . . whether from the same or different tracings, should be used to assess the severity of the respiratory impairment." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 3.00E. *See also Thacker v. Soc. Sec. Admin.*, 93 Fed. Appx. 725, 728 (6th Cir. Mar. 14, 2004).

The plaintiff underwent several PFTs and registered several $FEV_1$ scores ranging from 1.11 to 2.07 liters and reported heights ranging from 60 to 64 inches. (Tr. 320-27.) In June of 2002, the plaintiff's $FEV_1$ was 1.71 liters and her height was 61 inches (tr. 327), in July of 2002, her $FEV_1$ was 1.96 liters and her height was 61 inches (tr. 324), in February of 2003, her $FEV_1$ was 2.07 liters and her height was 64 inches (tr. 322), in August of 2003, her

FEV$_1$ was 1.87 liters and her height was 64 inches (tr. 320), and in November of 2005, her FEV$_1$ was 1.11 liters and her height was 60 inches. (Tr. 261.) In determining whether she meets Listing 3.02A, the plaintiff contends that her lowest FEV$_1$ score of 1.11 should be used but the Regulations require that the plaintiff's highest FEV$_1$ score of 2.07 be used since she has multiple FEV$_1$ scores. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 3.00E.

For the plaintiff to meet Listing 3.02A with a FEV$_1$ score of 2.07, she must be at least 72 inches in height. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 3.02A. The plaintiff's measured height varies between 60 and 64 inches (tr. 320-327) and she testified that she is 61 inches tall. (Tr. 33.) Therefore, even though there is a discrepancy regarding her actual height, the range of her measured heights does not break the 72 inch barrier that a FEV$_1$ score of 2.07 requires to meet Listing 3.02A. Given that the plaintiff's highest FEV$_1$ score requires her to measure at least 72 inches in height and that none of her measured heights in the record come close to approaching that requirement, the plaintiff did not meet the requirements of Listing 3.02A.

Next, the plaintiff contends that the ALJ failed to take the plaintiff's obesity into consideration as a factor, which, in combination with the plaintiff's pulmonary problems, would equal Listing 3.02. Docket Entry No. 17 at 7-9; Docket Entry No. 22, at 1-2. At step three of the five step sequential process, the ALJ concluded that the plaintiff's obesity did not affect her ability to ambulate, but he did not specifically address how her obesity

affected her pulmonary impairments. (Tr. 16.)   In determining whether a plaintiff's pulmonary impairment meets or equals a Listing, the Regulations require the ALJ to consider obesity since it "is a medically determinable impairment that is often associated with disturbance of the respiratory system, and disturbance of this system can be a major cause of disability in individuals with obesity.   The combined effects of obesity with respiratory impairments can be greater than the effects of each of the impairments considered separately."[32] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 3.00I.

However, the ALJ also noted at step three of the five step sequential evaluation that "[t]here is no opinion of a medical expert designated by the Commissioner of Social Security that has indicated that she has an impairment or combination of them that medically equals listing level severity.   In fact, Reeta Misra, M.D., the designated State

---

[32] Additionally, SSR 02-1p provides that
obesity affects the cardiovascular and respiratory systems because of the increased workload the additional body mass places on these systems. Obesity makes it harder for the chest and lungs to expand. This means that the respiratory system must work harder to provide needed oxygen. This in turn makes the heart work harder to pump blood to carry oxygen to the body. Because the body is working harder at rest, its ability to perform additional work is less than would otherwise be expected. Thus, we may find that the combination of a pulmonary or cardiovascular impairment and obesity has signs, symptoms, and laboratory findings that are of equal medical significance to one of the respiratory or cardiovascular listings.

However, we will not make assumptions about the severity or functional effects of obesity combined with other impairments. Obesity in combination with another impairment may or may not increase the severity or functional limitations of the other impairment. We will evaluate each case based on the information in the case record.

Soc. Sec. Rul. 02-1p, 2000 WL 628049, at *6 (Sept. 12, 2002).

agency medical consultant, found to the contrary. Therefore, no listing has been medically equaled." (Tr. 16.)  Additionally, the Regulations provide that when evaluating medical equivalency, an ALJ should consider all record evidence "about [the plaintiff's] impairment(s) and its effects on [the plaintiff]," including "the opinion given by one or more medical or psychological consultants designated by the Commissioner." 20 C.F.R. 404.1526(c).

The plaintiff's argument that the ALJ should have been more transparent in his analysis of whether her obesity and pulmonary impairments medically equaled a listed impairment is well-taken, but the ALJ complied with the Regulations in relying on Dr. Misra's RFC assessment as support for concluding that the plaintiff's impairments did not medically equal a Listing.  Dr. Misra noted that the plaintiff should avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation, acknowledging the severity of her pulmonary impairment, but ultimately concluded that while her "impairment is severe [it falls] short of [the] [L]istings." (Tr. 268, 271.)  Further, the plaintiff was diagnosed with obesity on several occasions (tr. 259, 278, 307, 312-13, 351) but no physician ever attributed her pulmonary limitations directly to obesity, and all of her $FEV_1$ scores, which were above the Listing requirement, were recorded after being diagnosed with obesity.  In sum, the ALJ could have provided the plaintiff with a clearer explanation about whether her pulmonary impairments and obesity equaled the Listing, but Dr. Misra's RFC

assessment and the record evidence supported the ALJ's determination that the plaintiff's impairments did not meet or medically equal a listed impairment.

Finally, the plaintiff argues that the ALJ failed to consult a medical expert ("ME") in concluding that her impairments did not meet or medically equal a Listing. Docket Entry No. 17, at 8-9. The ALJ has "'the ultimate responsibility for ensuring that every [plaintiff] receives a full and fair hearing. . . .'" *Simpson v. Comm'r of Soc. Sec.*, 344 Fed. Appx. 181, 189 (6th Cir. Aug. 27, 2009) (quoting *Lashley v. Sec'y of Health and Human Servs.*, 708 F.2d 1048, 1051 (6th Cir. 1983)). *See also Kendrick v. Shalala*, 998 F.2d 455, 458 (7th Cir.1993) ("[h]ow much evidence to gather is a subject on which district courts must respect the Secretary's reasoned judgment"). In carrying out this responsibility, the Regulations provide the ALJ with considerable discretion, rather than a mandate, in deciding whether to seek testimony from a ME. 20 C.F.R. § 404.1527(f)(2)(iii) ("Administrative law judges may also ask for and consider opinions from medical experts on the nature and severity of your impairment(s) and on whether your impairment(s) equals the requirements of any impairment listed in appendix 1 to this subpart."). *See Simpson*, 344 Fed. Appx. at 189 (citing *Davis v. Chater*, 104 F.3d 361, 1996 WL 732298, at *2 (6th Cir. Dec. 19, 1996).

The plaintiff notes that in determining medical equivalency,

[l]ongstanding policy requires that the judgment of a physician (or psychologist) designated by the Commissioner on the issue of equivalence on the evidence before the administrative law judge or the Appeals Council

> must be received into the record as expert opinion evidence and given
> appropriate weight.

Docket Entry No. 17, at 8 (quoting Soc. Sec. Rul. 96-6p, 1996 WL 374180, at *3 (July 2, 1996)).

However, the above passage to which the plaintiff cites is an excerpt of a broader section

of SSR 96-6p that discusses the role of the ALJ and the ME. Soc. Sec. Rul. 96-6p, 1996 WL

374180, at *3-4. Under the section addressing the medical equivalency to a listed

impairment, SSR 96-6p provides that

> [t]he administrative law judge or Appeals Council is responsible for deciding
> the ultimate legal question whether a listing is met or equaled. As trier of the
> facts, an administrative law judge or the Appeals Council is not bound by a
> finding by a State agency medical or psychological consultant or other
> program physician or psychologist as to whether an individual's
> impairment(s) is equivalent in severity to any impairment in the Listing of
> Impairments. However, longstanding policy requires that the judgment of
> a physician (or psychologist) designated by the Commissioner on the issue
> of equivalence on the evidence before the administrative law judge or the
> Appeals Council must be received into the record as expert opinion evidence
> and given appropriate weight.
>
> The signature of a State agency medical or psychological consultant on an
> SSA-831-U5 (Disability Determination and Transmittal Form) or SSA-832-U5
> or SSA-833-U5 (Cessation or Continuance of Disability or Blindness) ensures
> that consideration by a physician (or psychologist) designated by the
> Commissioner has been given to the question of medical equivalence at the
> initial and reconsideration levels of administrative review. Other documents,
> including the Psychiatric Review Technique Form and various other
> documents on which medical and psychological consultants may record their
> findings, may also ensure that this opinion has been obtained at the first two
> levels of administrative review.
>
> When an administrative law judge or the Appeals Council finds that an
> individual s [sic] impairment(s) is not equivalent in severity to any listing,

the requirement to receive expert opinion evidence into the record may be satisfied by any of the foregoing documents signed by a State agency medical or psychological consultant. However, an administrative law judge and the Appeals Council must obtain an updated medical opinion from a medical expert in the following circumstances:

> When no additional medical evidence is received, but in the opinion of the administrative law judge or the Appeals Council the symptoms, signs, and laboratory findings reported in the case record suggest that a judgment of equivalence may be reasonable; or
>
> When additional medical evidence is received that in the opinion of the administrative law judge or the Appeals Council may change the State agency medical or psychological consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing of Impairments.

*Id.* (Footnote omitted.)

The wording of this section of SSR 96-6p is convoluted and it can be easily misinterpreted. The requirement that the ALJ "obtain an updated medical judgment from a medical expert" is not a mandate but is predicated upon the ALJ's discounting the medical findings of state agency medical or psychological consultants with the intent of concluding that the plaintiff equals a listed impairment based on "the symptoms, signs, and laboratory findings" in the record.[33] *Id.*

_____

[33] Although the defendant's position is not totally clear, it appears that the defendant maintains that the ALJ properly consulted an ME and complied with SSR 96-6p inasmuch as the ALJ specifically noted that Dr. Misra, a DDS consultant, determined that the plaintiff did not meet or medically equal a Listing. *See* Docket Entry No. 20, at 11; Tr. 16. Although the plaintiff's position was initially also unclear, *see* Docket Entry No. 17, at 9, the plaintiff clearly indicated in her reply that she believed that an ME should have testified at the

The Sixth Circuit has not been consistent in its analysis of whether an ALJ is required to solicit the testimony of a medical expert. In *Retka v. Comm'r of Soc. Sec.*, 70 F.3d 1271, 1995 WL 697215, at *2 (6th Cir. Nov. 22, 1995), the Sixth Circuit noted that "[g]enerally the opinion of a medical expert is required before a determination of medical equivalence is made," but in later decisions in *Davis* and *Simpson*, the Sixth Circuit noted that the Regulations give the ALJ discretion in deciding whether or not to call a medical expert. *Simpson*, 344 Fed. Appx. at 189; *Davis*, 104 F.3d 361, 1996 WL 732298, at *2. Further, in *Kelly v. Comm'r of Soc. Sec.*, 314 Fed. Appx. 827, 830-31 (6th Cir. Feb. 2, 2009), the Sixth Circuit found that SSR 96-6p "govern[ing] the need for updated expert medical opinions," requires an update when "there is evidence of symptoms, signs, and findings that *suggest to the ALJ or Appeals Council* that the [plaintiff's] condition may be equivalent to the listings . . . ." (Emphasis added.) Thus, the Sixth Circuit's position seems to be that testimony from a medical expert for an equivalency determination is required if (1) the ALJ or Appeals Council, after reviewing the evidence of symptoms, signs, and findings, is inclined to conclude that the plaintiff's condition may be equivalent to the Listings or (2) the ALJ or Appeals Council, after reviewing additional medical evidence, determines that the new evidence may change the State agency medical or psychological consultant's finding that the plaintiff's impairment(s) do not equal a Listing. *See Kelly*, 314 Fed. Appx. at 830.

─────────────────────

hearing. Docket Entry No. 22, at 2. Therefore, the Court has focused on that argument.

In this case, the ALJ assigned controlling weight to Dr. Misra's RFC, a consultative DDS physician, in determining that the plaintiff's impairments did not meet or equal any listed impairment, including Listing 3.02A. (Tr. 16.) As discussed *supra*, Dr. Misra properly relied on Dr. Payne's evaluation in completing her RFC and there is substantial evidence in the record which supports her findings. Since the ALJ assigned controlling weight to Dr. Misra's RFC and concluded that the plaintiff's impairments did not equal one of the Listings, neither prong of the two pronged requirement in SSR 96-6p was met and thus, the ALJ was not required to elicit testimony of an ME. *See* Soc. Sec. Rul. 96-6p, 1996 WL 374180, at *3-4.

### 3. The ALJ erred in concluding at step four of the five step evaluation process that the plaintiff could perform her past relevant work as a part-time test grader.

The plaintiff asserts that the ALJ incorrectly determined that the plaintiff could perform her past relevant work as a part-time test grader. Docket Entry No. 17, at 11. The Commissioner concedes that, since the plaintiff "performed this work on a part time basis," it should not be classified as past relevant work. Docket Entry No. 20, at 13. *See* 20 C.F.R. § 404.1572(a). Therefore, the Court will focus only on the plaintiff's assertions of error pertaining to the ALJ's alternate step five determination that she had the RFC to perform

sedentary work and could work as a receptionist/information clerk and general office clerk.

(Tr. 20.)

### 4. The ALJ's failure to ask the VE specifically about the Dictionary of Occupational Titles ("DOT") and comply with SSR 00-4p was harmless error.

The plaintiff argues that the ALJ failed to comply with SSR 00-4p because he did not explicitly ask the VE whether his testimony was consistent with the DOT. Docket Entry No. 17 at 12-14. ALJs have an "affirmative duty" to ask VEs whether "the evidence that they have provided 'conflicts with the information provided in the DOT [Dictionary of Occupational Titles].'" *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 606 (6th Cir. 2009) (quoting Soc. Sec. Rul. 00-4p, 2000 WL 1898704, at *4 (Dec. 4, 2000)).

However, an ALJ's failure to specifically question the VE about any conflicts his evidence may have with the DOT is typically viewed as harmless error. *Fleeks v. Comm'r of Soc. Sec.*, 2009 WL 2143768, at *6 (E.D. Mich. July 13, 2009); *Masters v. Astrue*, 2008 WL 4082965, at *3 (E.D. Ky. Aug. 29, 2008). On the other hand, when the VE's testimony is in conflict with the DOT, the ALJ has the additional duty to obtain a reasonable explanation for the discrepancy. *Fleeks*, 2009 WL 2143768, at *6; Soc. Sec. Rul. 00-4p, at *4 ("When vocational evidence provided by a VE or VS [vocational specialist] is not consistent with information in the DOT, the adjudicator must resolve this conflict before relying on the VE

or VS evidence to support a determination or decision that the individual is or is not disabled. The adjudicator will explain in the determination or decision how he or she resolved the conflict.") Thus, if there is no inquiry into whether the VE's testimony is consistent with the DOT and there is, in fact, an inconsistency, the ALJ's error is not harmless. *Lancaster v. Comm'r of Soc. Sec.*, 228 Fed. Appx. 563, 575 (6th Cir. Apr. 26, 2007); *Fleeks*, 2009 WL 2143768, at *6. In this case, there is no identified inconsistency between the VE's testimony and the DOT. Therefore the ALJ's error is harmless.

The plaintiff also contends that the VE mischaracterized the plaintiff's transferable skills, arguing that communication and "attending" are aptitudes instead of skills. Docket Entry No. 17 at 13-14. According to SSR 82-41, a skill is a "practical and familiar knowledge of the principles and processes of an art, science or trade, combined with the ability to apply them in practice in a proper and approved manner." Soc. Sec. Rul. 82-41, 1982 WL 31389, at *2 (1982). When an ALJ finds that a plaintiff has

> transferable skills, the acquired work skills must be identified, and specific occupations to which the acquired work skills are transferable must be cited in the State agency's determination or ALJ's decision. Evidence that these specific skilled or semiskilled jobs exist in significant numbers in the national economy should be included (the regulations take administrative notice only of the existence of unskilled sedentary, light, and medium jobs in the national economy). This evidence may be [a vocational specialist's] statements based on expert personal knowledge or substantiation by information contained in the publications listed in regulations sections 404.1566(d) and 416.966(d).

Soc. Sec. Rul. 82-41, 1982 WL 31389, at *7. The VE testified that "record-keeping skills," "judgment skills," "communication skills," and "attending skills, which doesn't mean being present but which means giving attention to," would transfer from the plaintiff's job as a teacher to sedentary work as a receptionist/information clerk and general office clerk. (Tr. 37, 41.) Since the ALJ relied on the VE's testimony in making his step five determination, he complied with SSR 82-41 and correctly concluded that the plaintiff had transferable skills that enabled her to perform work as a receptionist/information clerk and general office clerk.

## IV. RECOMMENDATION

For the above stated reasons, it is recommended that the plaintiff's motion for judgment on the administrative record (Docket Entry No. 16) be DENIED and that this action be DISMISSED.

Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this Report and Recommendation and must state with particularity the specific portions of the Report and Recommendation to which objection is made. Failure to file written objections within the specified time can be deemed a waiver of the right to appeal the District Court's Order regarding the Report and

Recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d

947 (6th Cir. 1981).


Respectfully submitted,


_____

JULIET GRIFFIN
United States Magistrate Judge